L. Scott Keehn, SBN 61691
Leslie F. Keehn, SBN 199153
**KEEHN & ASSOCIATES, APC**
402 W. Broadway, Suite 1210
San Diego, California 92101
Telephone: (619) 400-2200
Facsimile: (619) 400-2201
Email: scottk@keehnlaw.com; lesliek@keehnlaw.com

Attorneys for Debtor-in-Possession,
QUALITYBUILT.COM, a California corporation

# UNITED STATES BANKRUPTCY COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

In Re:

**QUALITYBUILT.COM**, a California corporation,

Debtor-in-Possession.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  09-12113-PB11

Chapter 11

**REPLY TO "UNITED STATES TRUSTEE'S RESPONSE TO DEBTOR'S MOTION ETC."**

Hearing Date:    March 1, 2010
Hearing Time:    10:30 a.m.
Dept.:                4
Judge:               The Honorable Peter W. Bowie

## I. <u>INTRODUCTION</u>

This Debtor has been challenged by cash flow that ranges from marginal to inadequate since the commencement of the case.  That in turn has severely jeopardized its ability to preserve whatever "*going concern*" value is operating assets may have.  It also created the specter of massive claims being asserted on account of breaches of executory contracts, which would result from the Debtor's inability to perform those contracts as a result of inadequate cash flow, leaving it unable to conduct its business.  At the outset, the magnitude of those claims were estimated at

119408/5537.09

$7.92 Million[1] and is currently estimated to be between $6 – 7 Million.  Simply put, the Debtor's greatest challenge has been to sell its operating assets before its inability to sustain ongoing operations deprived them of their *going concern* value.

As more fully appears from the Operating Reports filed concurrently herein, the Debtor has incurred substantial operating losses since the filing of the case, and its ability to sustain operations, and a *going concern* value of the assets, appears to be rapidly coming to a close.  However, the Debtor's efforts to extract maximum value from its operating assets will be realized upon the approval of the sale of those operating assets pursuant to the pending motion.  This sale is in the best interest of the Debtor, its' estate and creditors, and no one has advanced any facts that would support the notion that there is a more attractive, or beneficial option available to this Debtor at this time.  The motion should be approved.

## II. DISCUSSION

1.     The Buyer selected the name "Quality Built, LLC" to facilitate a *seemless* transition from seller to buyer as possible.  Other than the new lease of the Colorado facility, and employment agreements with Mr. Luhr and Ms. Michaelis, disclosed in paragraphs 7.1(i) and (j) respectively of the Amended and Restated Asset Purchase Agreement, there is no involvement between the Debtor's insiders and the Buyer.

2.     Concurrently herewith the Debtor is filing a notice of its request to reduce the amount of the initial overbid from $60,000 to $30,000.  At the same time, that notice is being served on all of the entities which were believed to have any interest in acquiring the assets/assumed contracts following the abandonment of the sale initially proposed as part of the First Day Motions.

3.     Most of the marketing efforts undertaken by the Debtor were disclosed in paragraphs 10 – 14 of the Omnibus Michaelis Declaration (Exhibit A to the Reply Declaration of

---

[1]     See the "Memorandum of Points and Authorities in Support of Motion to Sell Substantially all of Debtor's Assets, etc.," filed August 20, 2009, Doc. 18 – 25, pg. 58 – 89, a copy of which is attached hereto marked Exhibit A, and incorporated herein by this reference (the "8/20/09 MPA").

KEEHN & ASSOCIATES, APC
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELECOPIER (619) 400-2201
TELEPHONE (619) 400-2200

Elizabeth Michaelis filed concurrently herewith), and paragraphs 21 – 23 of the Omnibus Luhr Declaration (Exhibit A to the Reply Declaration of Stanley Luhr filed concurrently herewith). These marketing activities were appropriate and adequate to reach all entities that reasonably may have an interest in acquiring the very specialized assets which are the subject of the motion.

4.      As the United States Trustee correctly observed, there is a typographical error in paragraph 5.22 of the Amended and Restated Asset Purchase Agreement.  That paragraph begins with the phrase, "*Except as set forth on Schedule 5.21...*".  The opening phrase was intended to read, "*Except as set forth on Schedule 5.21, and paragraph 7.1(i) and (j) below...*"  that correction will be set forth in an amendment to the "Amended and Restated Asset Purchase Agreement."

5.      The United States Trustee correctly observes that the Buyer in the originally proposed sale, is identical to the Buyer in the currently proposed sale are identical, but that the price has decreased.  The decrease is explained by the following:

- While the Buyer is the same but, the assets being transferred are not.  The judgments which were part of the assets in the sale as originally proposed, are no longer being transferred; and,

- The value of the work-in-process/contracts being assumed and assigned, is currently less than the value of the contracts which would have been assumed and assigned in the originally proposed transaction.  That is largely due to the fact that approximately $1.2 Million of revenue has been received by the Debtor on account of its performance of contracts that would have been included in the originally proposed transaction; and, the fact that new work-in-process of comparable value has not replaced the contracts which have been performed.

6.      United States Trustee has raised the issue that the sale of substantially all of the Debtor's operating assets may constitute an impermissible *sub rosa plan*.  That is a concern that is universally present whenever a debtor-in-possession proposes to sell substantially all of its assets outside the confines of a Chapter 11 plan of reorganization.  Recognizing that reality, the Debtor addressed the issue at length in the 8/20/09 MPA, and particularly in paragraphs III. D. through F., all of which are incorporated herein by this reference.  As it addresses the *sub rosa plan* issue the

KEHLIN & ASSOCIATES, APC
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2201
TELECOPIER (619) 400-2201

-3-

119408/5537.09

most key portion of that argument is restated below:

"Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "*the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.*"[2]  One of the rationales for granting this authority was explained by the District Court for the Southern District of California as follows:

> The salutary purpose of the Bankruptcy Act is to preserve the assets of the bankrupt for the benefit of the creditors.  An order authorizing the sale of the assets of the bankrupt is intended to effectuate this purpose.[3]

And other District Courts have recognized:

> "Judicial sales are an indispensable part of the machinery employed in administering bankrupt estates." [Citation.]  Public policy requires that nothing be done to impair confidence in the stability of such judicial sales, and bona fide purchasers should not be deprived of their rights without just cause.[4]

The Code authorizes a debtor in possession to sell estate assets prior to and outside a plan of reorganization.[5]  Indeed, Section 363 is a grant of broad and flexible power to the bankruptcy court grounded in business judgment and practical reality.  In *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),*[6] the Second Circuit explained its sweep and the precedential standards.  The court began with an historical overview of the bankruptcy provisions that have

---

[2]  11 U.S.C. § 363(b)(1); see e.g., *In re Med. Software Solutions*, 286 B.R. 431, 441 (Bankr. D. Utah 2002) (court approved sale of essentially all of debtor's assets at outset of Chapter 11 case, finding (i) there would be substantial decrease in the value of the assets if not sold immediately, (ii) existing customers would be reluctant to purchase services and goods from company "in tenuous financial condition" and (iii) company would be "unsustainable as a going concern without additional capital - which is unavailable"); *In re Naron & Wagner, Chartered*, 88 B.R. 85, 90 (Bankr. D. Md. 1988) (approving sale of operating subsidiary where purchase price exceeded its estimated liquidation value and "failure to close the sale quickly will likely result in a halt of [the business'] continuous operations").

[3]  *In re Airlines Transport Carriers, Inc.*, 129 F. Supp. 679, 684 (S.D. Cal. 1955).

[4]  *In re Strunks Lane & Jellico Mountain Coal & Coke Co.*, 64 F. Supp. 731, 733 (D. Ky. 1946).

[5]  See e.g., *In re Naron & Wagner, Chartered*, supra (debtor authorized to sell all of its operating assets before filing a plan).

[6]  *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983).

KEEHN & ASSOCIATES, APC
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELECOPIER (619) 400-2201

permitted the sale of a debtor's assets outside a final plan of liquidation or reorganization.[7]  The court noted that initially such sales were permitted only where the property to be sold was "*of a perishable nature, or likely to deteriorate in value.*"[8]

Subsequently, the standard evolved beyond "*perishable*" situations, to cases where property might lose value due to a broad range of economic exigencies.  Thus, in *In re Pedlow*,[9] for example, the court authorized a private sale of a stock of handkerchiefs during the Christmas season, noting that "*the sale of handkerchiefs depreciates greatly after the holidays*."[10] In support of its ruling, the *Pedlow* Court reasoned "*that 'perishable' fairly construed, means property which, for any reason, will deteriorate in value and that what is and what is not perishable may be safely left to the discretion of the court.*"[11]

Later, the principle was further extended to instances where "*a good business opportunity was presently available, so long as the parties could act quickly.*"[12]  Ultimately, an even broader standard emerged, as reflected in the seemingly unqualified language of section 363(b). Under that standard, as articulated in *Lionel*, a bankruptcy judge is afforded "*considerable discretion*" in determining whether to allow a sale prior to confirmation of a plan, but must "*expressly find . . . a good business reason to grant such an application.*"[13]

[7]  *In re Lionel Corp.*, supra, 722 F.2d at 1066-68.

[8]  *Id.* at 1066 (quoting Section 25 of the Bankruptcy Act of 1867, 14 Stat. 517).

[9]  *In re Pedlow*, 209 F. 841 (2d Cir. 1913).

[10]  *Id.* at 842.

[11]  *Id.*

[12]  *In re Lionel Corp.*, supra, 722 F.2d at 1069 (discussing *In re Sire Plan, Inc.*, 392 F.2d 497 (2d Cir. 1964)).

[13]  *In re Lionel Corp.*, supra, 722 F.2d at 1066 & 1071; see also, *Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate other than in the ordinary course of business may be conducted if a good business reason exists to support it"); *In re Chateaugay Corp.*, 973 F.2d 141, 144 (2d Cir. 1992)("The bankruptcy court was within its discretion, based on its consideration of all the factors. . . to determine that a good business reason existed to proceed with the sale now even if the preferred stock amount does not ultimately benefit creditors"); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *Walter v. Sunwest*

KEEHN & ASSOCIATES, APC
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200;
TELECOPIER (619) 400-2201

119408/5537.09

Here, the immediate sale of operating assets is necessary to preserve their going concern value. As the *Lionel* court's discussion of section 363(b) makes clear, the quintessential "*good business reason*" on which reorganization courts have historically justified the sale of a debtor's property prior to a plan is that any delay in the sale of the property threatens to erode significantly the value of that property.[14] As the *Lionel* court stated, "*[i]n such cases . . . the bankruptcy machinery should not straightjacket the bankruptcy judge so as to prevent him from doing what is best for the estate.*"[15]

Thus, courts applying 363(b) have routinely authorized the sale of a debtor's operating assets in advance of the plan process where the debtor did not have sufficient liquidity to continue operating, and the cessation of operations was likely or certain to result in the debtor's inability to realize the going concern value of its business.[16]

The common thread that runs through all of the cases is that — as a matter of pragmatic reality — the debtor could not sustain the costs of ongoing operation, and the going concern value

_____

*Bank (In re Walter)*, 83 B.R. 14, 14-15 (9th Cir. BAP 1987).

[14] *In re Lionel Corp.*, supra, 722 F.2d at 1066-69; see also, In re V. Loewer's Gambrinus Brewery Co., 141 F.2d 747, 749 (2nd Cir. 1944).

[15] *In re Lionel Corp.*, supra, 722 F.2d at 1069.

[16] See, e.g., *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (approving sale of radio station where debtor lacked funds to continue operations and could lose broadcast license if station went off the air); *In re Brookfield Clothes, Inc.*, 31 B.R. 978 (S.D.N.Y. 1983) (approving sale of clothing manufacturer that had shut down due to lack of cash prior to petition date); *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 244 (Bankr. S.D. W.Va. 1996) (approving sale of coal producer that could not fund operations and was nearly out of cash needed to operate pumps that prevented mines from flooding); *In re WBQ P'ship*, 189 B.R. 97, 102-03 (Bankr. E.D. Va. 1995) (approving sale of nursing homes as necessary to protect going concern value); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992) (approving sale of ice cream producer that lacked cash needed to perform maintenance necessary to continue operations); *In re Titusville Country Club*, 128 B.R. 396, 400 (Bankr. W.D. Pa. 1991) (approving sale of golf course at start of golf season where debtor had inadequate funds to maintain course for the season); *In re Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (approving sale of radio station because of lack of funds needed to continue to operate); *In re Naron & Wagner, Chartered*, 88 B.R. at 90 (Bankr. D. Md. 1988) (approving sale of computer business where debtor was unable to continue operations due to lack of liquidity); *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (approving sale of tire plant that needed major capital infusion to reach necessary production levels); *In re Boogaart of Fla., Inc.*, 17 B.R. 480, 483 (Bankr. S.D. Fla. 1981) (approving liquidation of grocer operating at a continual loss).

KEEHN & ASSOCIATES, APC
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE: (619) 400-2200;
TELECOPIER (619) 400-2201

119408/5537.09

of its assets would suffer a foreseeable and substantial decline in the absence of a prompt sale. That is exactly the situation the Debtor here now faces. Because delay in this instance will lead to an almost immediate loss in value for the Debtor' assets, the Sale should be approved forthwith."

### III. CONCLUSION

"*Equitable remedies are a special blend of what is necessary, what is fair and what is workable.*"[17]

The sale of assets as proposed by the pending motion has been created in a crucible of economic reality, and has emerged as a necessary, fair and workable solution to the challenge of extracting maximum value for the Debtor's operating assets. The window of opportunity for achieving that objective was narrow when the case began, and it has grown steadily more narrow with the passage of time. Although achieving that goal is now within the Estate's grasp, the window of opportunity will soon close. Now is the time, and proposed sale is the vehicle for securing that benefit to the Estate.

For this and all reason set forth above, and in the papers supporting the motion, this motion should be approved.

Dated: <u>February 18, 2010</u>

**KEEHN & ASSOCIATES**
A Professional Corporation


By: _____
    L. Scott Keehn
    for Debtor and Debtor-in-Possession
    **Qualitybuilt.com, a California corporation**

KEEHN & ASSOCIATES, APC
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200;
TELECOPIER (619) 400-2201

---

[17]    *See, Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973); *See* also, *In re Bonded Mailings, Inc.*, 20 B.R. 781, 786 (1982) (Bankr. E.D.N.Y. 1982).

119408/5537.09

# EXHIBIT A

1  L. Scott Keehn, SBN 61691
Leslie F. Keehn, SBN 199153
2  **KEEHN & ASSOCIATES, APC**
402 W. Broadway, Suite 1210
3  San Diego, California 92101
Telephone: (619) 400-2200
4
[Proposed] Attorneys
5  for Debtor and Debtor-in-Possession
Qualitybuilt.com, a California corporation
6
7
8                    **UNITED STATES BANKRUPTCY COURT**

9                 **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10  In Re:                              )    Case No.        09-12113-PB11
                                        )
11  **QUALITYBUILT.COM,**               )    Chapter 11
   a California corporation,            )
12                                      )    **MEMORANDUM OF POINTS AND**
                                        )    **AUTHORITIES IN SUPPORT OF MOTION**
13                      Debtor.         )    **TO SELL SUBSTANTIALLY ALL OF**
                                        )    **DEBTOR'S ASSETS FREE AND CLEAR OF**
14                                      )    **LIENS AND TO ASSUME AND ASSIGN**
                                        )    **CERTAIN EXECUTORY CONTRACTS**
15                                      )
                                        )
16                                      )
                                        )    Date:          N/A
17                                      )    Time:          N/A
                                        )    Dept.:         4
18                                      )    Judge:         Hon. Peter W. Bowie
                                        )
19                                      )

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

*(left margin, vertical text)* KEEHN & ASSOCIATES, APC  ATTORNEYS AT LAW  402 WEST BROADWAY, SUITE 1210  SAN DIEGO, CALIFORNIA 92101  TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

117972/5537.01

**TABLE OF CONTENTS**

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.   History of Qualitybuilt.com and Events Leading to Bankruptcy. . . . . . . . . . . . . . 1

   B.   The Proposed Sale Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   C.   The Secured Claims and Their Satisfaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   A.   Jurisdiction and Venue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   B.   Relief Requested. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   C.   The Sale Transaction Achieves The Fundamental Purpose Of Chapter 11.. . . . . . 6

   D.   The Sale Transaction Is Authorized By 11 U.S.C. § 363(b).. . . . . . . . . . . . . . . . . 8

   E.   Immediate Sale of the Purchased Assets Is Necessary to Realize Their
        Going Concern Value. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   F.   Debtor Has Exercised Sound Business Judgment in Proposing the Sale. . . . . . . . 12

   G.   Quality Built, LLC Is A Good Faith Purchaser Entitled To The Full Protection
        Of Section 363(m) Of The Bankruptcy Code; And The Sale Transaction Does
        Not Violate Section 363(n) Of The Bankruptcy Code. . . . . . . . . . . . . . . . . . . . . 13

        (1)   The Purchaser/Successful Bidder is Buying the Assets For Value . . . . . . 15

   H.   The Sale Of The Debtor's Assets Free And Clear Of Liens And Interests Is
        Authorized By Section 363(f) Of The Bankruptcy Code.. . . . . . . . . . . . . . . . . . . 15

        (1)   Section 363(f)(2) Is Satisfied as to Those Parties who Have Failed To
              Object to the Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        (2)   Section 363(f)(3) Is Satisfied Because the Sale Price Is Greater than
              the Aggregate Value of the Liens on the Property . . . . . . . . . . . . . . . . . . 17

              (a)   "Aggregate value of all liens" means the economic value of
                    those liens  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              (b)   The purchase price exceeds the economic value of the liens
                    on the property being sold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              (c)   The Sale Transaction satisfies Section 363(f)(5) because all
                    of the secured creditors affected could be compelled to accept
                    money in satisfaction of their claims . . . . . . . . . . . . . . . . . . . . . . 17

/ / /

/ / /

KEEHN & ASSOCIATES, APC
ATTORNEYS AND COUNSELLORS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 480-2200 • FACSIMILE (619) 480-2201

117975/5537.02

(d)    The Sale Of The Offered Assets May Be Made Free And
Clear Of Liens Because Secured Creditors' Interests Have
Been Afforded Adequate Protection As Required By Section
363(e) .............................................. 17

(3)    "Interest" is Broadly Interpreted by the Courts ..................... 18

I.    The Debtor's Assumption and Assignment To The Purchaser Of The Assumed
Contracts Is Authorized By Section 365 Of The Bankruptcy Code. ........... 19

V.    **CONCLUSION** ....................................................... 23

/ / /

/ / /

/ / /

KEEHN & ASSOCIATES, APC
ATTORNEYS AND COUNSELORS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · FACSIMILE (619) 400-2201

117975/5537.02

## TABLE OF AUTHORITIES

*In re Airlines Transport Carriers, Inc.*,
    129 F.Supp. 679 (S.D. Cal. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Alipat, Inc.*,
    36 B.R. 274 (Bankr. E.D. Mo. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Bel Air Assoc.*,
    706 F.2d 301 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Boogaart of Fla., Inc.*,
    17 B.R. 480 (Bankr. S.D. Fla. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Bradlees Stores, Inc.*,
    194 B.R. 555 (Bankr. S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Brookfield Clothes, Inc.*,
    31 B.R. 978 (S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Bygaph*,
    56 B.R. 596 (Bankr. S.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Canadian Pacific Forest Products Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*,
    66 F.3d 1436 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Channel One Committee, Inc.*,
    117 B.R. 493 (Bankr. E.D. Mo. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Chateaugay Corp.*,
    973 F.2d 141 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Chinichian v. Campolongo (In re Chinichian)*,
    784 F.2d 1440 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Collins*,
    180 B.R. 447 (Bankr. E.D. Va. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), In re Lionel Corp.*,
    722 F.2d 1063 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

*In re Condere Corp.*,
    228 B.R. 615 (Bankr. S.D. Miss. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Elliot*,
    94 B.R. 343 (E.D. Pa. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ewell v. Diebert (In re Ewell)*,
    958 F.2d 276 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Fesco Plastics Corp.*,
    996 F.2d 152 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

/ / /

KEEHN & ASSOCIATES, APC
ATTORNEYS AND COUNSELORS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2300  FAX (619) 400-4201

117975/5537.02

*Fields Station LLC v. Capitol Food Corp. of Fields Corner (In re Capitol Food Corp. of Fields Corner)*,
    490 F.3d 21 (1st Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Fitzsimmons v. Walsh (In re Fitzsimmons)*,
    725 F.2d 1208 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Florida Department of Revenue v. Piccadilly Cafeteria, Inc.*,
    128 S.Ct. 2326 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*,
    209 F.3d 252 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*FutureSource LLC v. Reuters Ltd.*,
    312 F.3d 281 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Gabel*,
    61 B.R. 661 (Bankr. W.D. La. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Global Crossing Ltd.*,
    295 B.R. 726 (Bankr. S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R.R. Co.*,
    318 U.S. 27 523 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Houston v. City Bank of New Orleans*,
    47 U.S. 486 (1848) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Ionosphere Clubs, Inc.*,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Ionosphere Clubs, Inc.*,
    100 B.R. 670 (Bankr. S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re James*,
    203 B.R. 449 (Bankr. W.D. Mo. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Jamesway Corp.*,
    201 B.R. 73 (Bankr. S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Johns-Manville Corp.*,
    60 B.R. 615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Johnson v. Alvarez (In re Alvarez)*,
    224 F.3d 1273 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Lady H Coal Co., Inc.*,
    193 B.R. 233 (Bankr. S.D. W.Va. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Licensing by Paolo v. Sinatra (In re Gucci)*,
    126 F.3d 380 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*In re M Capital Corp.*,
    290 B.R. 743 (B.A.P. 9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

KEEHN & ASSOCIATES, APC
ATTORNEYS AND COUNSELLORS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2700  FACSIMILE (619) 400-2701

117975/5537.02

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Medical Software Solutions*,
    286 B.R. 431 (Bankr. D. Utah 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Mr. Grocer, Inc.*,
    77 B.R. 349 (Bankr. D.N.H. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Myers v. U.S.*,
    297 B.R. 774 (S.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*,
    384 F.3d 108 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Naron & Wagner, Chartered*,
    88 B.R. 85 (Bankr. D. Md. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*In re Natco Industrial, Inc.*,
    54 B.R. 436 (Bankr. S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*North Am. Car Corp. v. Peerless Weighing & Vending Machine Corp.*,
    143 F.2d 938 (2d Cir. 1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Onouli-Kina Land Co.*,
    846 F.2d 1170 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
    4 F.3d 1095 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re PRJ Enterprises, Inc.*,
    235 B.R. 597 (Bankr. E.D. Tx. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Pedlow*,
    209 F. 841 (2d Cir. 1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Prime Motor Inns, Inc.*,
    166 B.R. 933 (Bankr. S.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ramco-Gershenson Properties, L.P. v. Serv. Merchandise Co., Inc.*,
    293 B.R. 169 (M.D. Tenn. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ray v. Norseworthy*,
    90 U.S. 128 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Richmond Leasing Co. v. Capital Bank, N.A.*,
    762 F.2d 1303 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Rickel Home Ctrs., Inc.*,
    240 B.R. 826 (D. Del. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

KEEHN & ASSOCIATES, APC
ATTORNEYS AND COUNSELORS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · FACSIMILE (619) 400-2201

117975/5537.02

*In re Rock Industrial Machine Corp.*,
    572 F.2d 1195 (7th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*In re Sanshoe Worldwide Corp.*,
    139 B.R. 585 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*In re Sasson Jeans, Inc.*,
    90 B.R. 608 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*In re Saxman*,
    325 F.3d 1168 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*In re Sire Plan, Inc.*,
    392 F.2d 497 (2d Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Stephens Industrial v. McClung*,
    789 F.2d 386 (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*In re Strunks Lane & Jellico Mountain Coal & Coke Co.*,
    64 F.Supp. 731 (D. Ky. 1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*In re Tabone, Inc.*,
    175 B.R. 855 (Bankr. D.N.J. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*In re The Circle K Corp.*,
    127 F.3d 904 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*In re Timbers of Inwood Forest Associates, Ltd.*,
    808 F.2d 363 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

*In re Titusville Country Club*,
    128 B.R. 396 (Bankr. W.D. Pa. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*In re Trans World Airlines*,
    322 F.3d 283 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*In re Turbowind, Inc.*,
    42 B.R. 579 (Bankr. S.D. Cal. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*In re V. Loewer's Gambrinus Brewery Co.*,
    141 F.2d 747 (2nd Cir. 1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Van Huffel v. Harkelrode*,
    284 U.S. 225 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

*In re WBQ Partnership*,
    189 B.R. 97 (Bankr. E.D. Va. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Walter v. Sunwest Bank (In re Walter)*,
    83 B.R. 14 (9th Cir. BAP 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*In re Weatherly Frozen Food Group, Inc.*,
    149 B.R. 480 (Bankr. N.D. Ohio 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

/ / /

KEEHN & ASSOCIATES, APC
ATTORNEYS AND COUNSELORS AT LAW
403 WEST BROADWAY, SUITE 1300
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2260 · FACSIMILE (619) 400-2201

117975/5537.02

*In re Westview 74th St. Drug Corp.*,
        59 B.R. 747 (Bankr. S.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Willemain v. Kivitz*,
        764 F.2d 1019 (4th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**FEDERAL STATUTES**

11 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7

11 U.S.C. § 105(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11 U.S.C. § 363 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13, 15, 20

11 U.S.C. § 363(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 18

11 U.S.C. § 363(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11 U.S.C. § 363(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

11 U.S.C. § 363(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 18, 19

11 U.S.C. § 363(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

11 U.S.C. § 363(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

11 U.S.C. § 363(f)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

11 U.S.C. § 363(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15

11 U.S.C. § 363(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

11 U.S.C. § 365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

11 U.S.C. § 365(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

11 U.S.C. § 365(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

11 U.S.C. § 365(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

11 U.S.C. § 365(b)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

11 U.S.C. § 365(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

11 U.S.C. § 365(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

11 U.S.C. § 365(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

11 U.S.C. § 365(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

28 U.S.C. § 157(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 1334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 1408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KEEHN & ASSOCIATES, APC
ATTORNEYS AND COUNSELORS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 FACSIMILE (619) 400-2201

117975/5537.02

1    28 U.S.C. § 1409 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2    **STATE STATUTES**

3    Cal. Civ. Code § 1473 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

4    Cal. Civ. Code § 1478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5    Cal. Civ. Code § 1500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

6    **MISCELLANEOUS**

7    7 Collier on Bankruptcy ¶ 1100.01, Resnick & Sommer eds., 15th ed. rev. 2008 . . . . . . . . . . . . 6

8    H.R. Rep. No. 95-595, at 220 (1977),
9          reprinted in U.S. Code Cong. & Admin. News, 1978, p. 5787 . . . . . . . . . . . . . . . . . . . . . . . 6

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KEEHN & ASSOCIATES, APC
ATTORNEYS AND COUNSELORS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · FACSIMILE (619) 400-2201

117975/5537.02

# I.    INTRODUCTION

The Debtor is rapidly running out of cash needed to continue operation, and preserve going concern value of its assets. It expects that its cash available for operations will be completely exhausted by the end of October 2009. At that point, damage claims from breaches of executory contracts in the amount of $7.92 Million are projected. In order to avert those obviously disastrous consequences, the Debtor's management had exercised their best efforts to negotiate a sale of the Debtor's assets that would preserve going concern value, and avert the monumental liabilities otherwise threatened as a consequence of foreseeable breaches of contract.

Those efforts were successful and the Debtor was able to negotiate an extensive Asset Purchase Agreement with the Purchaser.[1] That agreement also provides for an over bidding procedure – basically an auction – where other potentially interested bidders will have the opportunity to make competing bids for the same assets. The procedure is intended to ensure that the Debtor and its estate are able to realize maximum possible value for the Purchased Assets as a result of the Sale Transaction contemplated by the Asset Purchase Agreement. The performance of the Asset Purchase Agreement, and consummation of the Sale Transaction that it contemplates, will provide maximum value to the Debtor's estate, and ultimately its creditors. The proposed assumption, and assignment of the Assumed Contracts pursuant to the Asset Purchase Agreement is a necessary component to the Asset Purchase Agreement. That, too, is in the best interests of all creditors. The proposed Sale Transaction should be approved.

# II.    FACTUAL BACKGROUND[2]

## A.    History of Qualitybuilt.com and Events Leading to Bankruptcy.

Debtor has its origins in certain construction quality metrics that founder Stanley R. Luhr began developing in 1983 after he saw an increase in insurance costs coupled with a decrease in quality. As the program around which he was building the metrics was maturing, Mr. Luhr

---

[1] Capitalized terms not otherwise defined herein shall have the respective meanings given to them in the Motion, The Sale Procedures Order, the Purchase Agreement, all Exhibits to the foregoing or the Bankruptcy Code (Title 11 U.S.C. § 101 et seq.).

[2] The factual matters set forth herein are supported by the Declarations of Stanley R. Luhr and Elizabeth R. Michaelis, contemporaneously filed herewith.

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

obtained three patents, and several trademarks and copyrights for the business processes he was developing.

Debtor was officially formed in 1998, and became quite popular with builders and insurance companies because it was the first advanced risk consulting firm to specifically quantify the true risk for a construction project, and develop methodologies to reduce or eliminate that risk. In 2005, at the peak of the construction boom, Debtor was the largest and most advanced company of its kind in the country, with nearly 200 direct employees, and active operations in 33 states. Debtor was named one of the twenty-five "Fastest Growing Companies" and was the only advanced risk consultant firm to be specifically endorsed by numerous national insurance companies.

After 2006, however, as the economy in general and the construction industry specifically began taking a downtown, Debtor's revenues began dropping precipitously. Builders began canceling projects, filing for bankruptcy, and/or terminating contracts. Debtor's revenue fell to $8 million in 2007, after reaching a peak of $23.2 million in 2005. The first seven months of 2009 have produced just $2.5 million in revenue.

Over the past 18 months, Debtor has received more than 30 bankruptcy notices from various builders across the country with whom it worked, numerous notifications that projects were being shut down, and several requests for refunds or reductions in contract scope and price. Longstanding projects have been abandoned, and two builder clients have even tragically committed suicide.

Two large lawsuits have also affected Debtor's ability to weather the financial and economic storm. A $1.7 million judgment Debtor obtained against its largest competitor remains uncollected, as the competitor recently itself filed for Chapter 11 bankruptcy. Debtor's largest subcontractor was awarded $3.6 million against Debtor by an arbitrator. Debtor believes the award to be erroneous and inconsistent with the evidence, but currently lacks the necessary funds to contest the award. Efforts to settle both of these cases by Mr. Luhr personally have failed.

Debtor's efforts to rebound from this financial peril have been significant and far-reaching. Debtor has reduced its staff by 90% since 2006, re-negotiated internal contracts, and shut down its

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

-2-

117972/5537.01

Colorado training facility. Debtor reached out to sixteen of its insurance company clients and offered to sell full, searchable copies of all data related to each client's insureds. None of the clients accepted.

Debtor made active efforts to solicit potential buyers, reaching out to anyone who had shown interest in the company before. Blog postings were made, a detailed prospectus was created, and Power Point presentations were forwarded to potential interested parties. Mr. Luhr and Ms. Michaelis reached out to anyone who might have interest in acquiring the company, from disinterested venture capital entities and other investors, to insurance companies. Market conditions have dissuaded any from pursuing a purchase.

Finally, in July 2009, detailed negotiations to purchase Debtor's assets began with Gary Elzweig, who had first indicated interest in acquiring the company a few years before. A purchase price was eventually agreed upon, and an Asset Purchase Agreement was prepared. Debtor believes that this sale of the assets represents the last and only remaining opportunity to provide continued services to Debtor's customers. Until this sale is consummated, which consummation is expected to occur in October 2009, Debtor is unable to continue operations in the absence of bankruptcy protection.

Accordingly, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 14, 2009 ("Petition Date"). The primary reason for the filing was to preserve Debtor's going concern value, and to facilitate the sale of its assets. Debtor's business is tied intimately to the construction sector of the economy, and its revenues have suffered a serious decline as a result of the equally significant economic reversals suffered throughout that sector of the economy. These reversals have impacted both new business and the ability to collect fully on accounts receivable. In the end, Debtor's depleted revenue stream has left it unable to meet the cash demands of its operations in the long - or even immediate - term. Once the sale of assets is consummated, Debtor will turn its attention to determining how best to maximize the value of its non-operating assets - which include the seven-figure judgment against the former competitor - and will either present a Chapter 11 Plan to achieve that purpose, or convert the case to a liquidation proceeding under Chapter 7.

-3-

117972/5537.01

**B.      The Proposed Sale Transaction.**

The Sale Transaction Provides for the sale of virtually all of the Debtor's assets used in the operation of its business.  When the Sale Transaction has been concluded, the only significant assets remaining in the Debtor's estate will be the litigation claims identified on Schedule 1.1(k) of the Asset Purchase Agreement.  These litigation claims include a $1.7 Million judgment against West Coast Property Consultants, Inc., and they may have significant residual value to the estate.  In exchange for the Purchased Assets the Debtor will receive a total Purchase Price of at least $450,000, pursuant to the provisions of Paragraph 3.1 of the Asset Purchase Agreement, which provides in its entirety as follows:

> **3.1      Purchase Price.**  If, at the conclusion of the auction authorized by the Sale Procedures Order, Buyer is declared the winning bidder for the Purchased Assets, then in consideration of the sale, transfer, conveyance and assignment of the Purchased Assets to Buyer, Buyer shall furnish to Seller for and on account of the Purchased Assets the Purchase Price as defined by this Section 3.1.  "Purchase Price" means $450,000.  The Purchase Price shall be comprised of the following components:
>
> (a)      cash in the amount of $150,000 (the "Cash Consideration"); and
> (b)      the assumption by Buyer of the Assumed Indebtedness. [Up to $300,000]

The Cash Consideration component of the purchase price may exceed $150,000, in the event that qualified bidders appear and make competing bids for the Purchased Assets, in accordance with the Sale Procedure Order, a copy of which is filed concurrently herewith as Exhibit 2 of the Compendium of Exhibits in Support of First Day Motions.[3]  If any qualified bidder makes a competing bid, then the Purchaser will be entitled to a $50,000 Breakup Fee, as more fully described in the Sale Procedures Order.

The bidding process and consummation of the Sale Transaction are governed by the terms of the Sale Procedure Order.  That order should be consulted for a complete understanding of the process.

/ / /

/ / /

---

[3] Unless otherwise indicated, all references to "Exhibit(s)" refer to the exhibits identified in the "Compendium of Exhibits in Support of First Day Motions" filed concurrently herewith.

117972/5537.01

**C.    The Secured Claims and Their Satisfaction**.

The Secured Creditors whose lien claims are impacted by this Motion are summarized below:

| CREDITOR | NATURE OF COLLATERAL | AMOUNT OF CLAIM |
|---|---|---|
| California Bank & Trust | UCC-1 Blanket Lien | $250,000.00 |
| Elizabeth R. Michaelis | UCC-1 Blanket Lien (Jr.) | $40,000.00 |
| Microsoft Financing (CIT Technology Fin. Svcs) | Microsoft Licenses | $20,901.36 |
| Dolphin Capital | Equipment Copier Leases | $6,500.00 |
| Leaf Funding | UCC-1 Lien re Equipment Lease | $6,168.52 |

With the exception of the claim of Elizabeth R. Michaelis, all of these secured Claimants are identified on Schedule 2.1(i) to the Asset Purchase Agreement. Accordingly, the obligations of each lien claimant (other than Elizabeth R. Michaelis) will be fully paid and performed in accordance with the respective contract terms pursuant to Paragraph 2.1 of the Asset Purchase Agreement, which provides in its entirety as follows:

> **2.1    Assumed Liabilities.**  Subject to the terms and conditions of this Agreement, at and as of the Closing, Buyer shall assume and agree to pay, perform, discharge and satisfy when due in accordance with their terms only the following liabilities and obligations of Seller and the Bankruptcy Estate:
>
> (i)    the secured indebtedness set forth on Schedule 2.1(i) up to an aggregate amount of $300,000 on terms acceptable to Buyer in its sole discretion (the "Assumed Indebtedness");
>
> (ii)    liabilities and obligations of Seller under the Assumed Contracts accruing, arising out of, or to be performed after the effective date of the assignment to Buyer of the Assumed Contracts (the "Assumed Liabilities"); and
>
> (iii)    accounts payable of Seller elected by Buyer to be assumed by Buyer (the "Assumed Accounts Payable").

/ / /

/ / /

/ / /

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2203

117972/5537.01

### III.    DISCUSSION

**A.    Jurisdiction and Venue.**

This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**B.    Relief Requested.**

The Debtor requests that the Court establish the identity of the Successful Bidder and any Backup Bidders, and approve the sale of assets as well as the assumption and assignment of the Assigned Contracts as provided in the Asset Purchase Agreement upon completion of the procedures prescribed in the Sales Procedures Order, as the same may be modified by further order of the Court. To achieve that result, the Debtor requests that the approvals be embodied in an order (the "Sale Order") to be in substantially the form set forth in Exhibit 3, filed concurrently herewith.

**C.    The Sale Transaction Achieves The Fundamental Purpose Of Chapter 11.**

The fundamental and overriding objective of a business reorganization in bankruptcy is – and always has been – to enable the debtor to preserve its business as a going concern.[4] Preserving the debtor's business as a going concern permits the economy to benefit from the continued participation of the debtor's productive assets; it permits the debtor's employees to keep their jobs; and it preserves for the debtor's creditors the incremental value of the going concern over the liquidation value.[5]

---

[4] *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources"); *North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp.*, 143 F.2d 938, 940 (2d Cir. 1944) ("the purpose of reorganization clearly is to rehabilitate the business and start it off on a new and to-be-hoped-for more successful career").

[5] See 7 Collier on Bankruptcy ¶ 1100.01 (Resnick & Sommer eds., 15th ed. rev. 2008) ("Chapter 11 embodies a policy that it is generally preferable to enable a debtor to continue to operate and to reorganize its business rather than simply to liquidate a troubled business. Continued operation may enable the debtor to preserve any positive difference between the going concern value of the business and the liquidation value. Moreover, continued operation can save the jobs of employees, the tax base of communities, and generally reduce the upheaval that can result from termination of a business").

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

117972/5537.01

1          When Congress undertook to overhaul the nation's bankruptcy laws with the

2  Bankruptcy Reform Act of 1978, it underscored this fundamental objective of a business

3  reorganization in what is now chapter 11 of the United States Bankruptcy Code, 11 U.S.C.

4  §§ 101 *et seq* (the "Bankruptcy Code").[6]  Thus, in a business reorganization case, among all

5  the other policies served by specific provisions of the Bankruptcy Code, this fundamental

6  objective of preserving the debtor's business as a going concern is paramount.[7]  Because of

7  the paramount importance of this fundamental objective, reorganization courts have long

8  recognized that, where the sale of the debtor's assets prior to the plan process is necessary to

9  preserve the business as a going concern, or the going concern value of its assets, the court

10 has the authority to approve the sale – pursuant to both specific authorizations in the statute,

11 and the power implied from the general equity powers of the court.[8]  Thus, the long history

---

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

[6]  See H.R. Rep. No. 95-595, at 220 (1977), reprinted in U.S. Code Cong. & Admin. News, 1978, p. 5787 ("The purpose of a business reorganization case, unlike a liquidation case, is to restructure the business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap. . . . It is more economically efficient to reorganize than to liquidate, because it preserves jobs and assets.").

[7]  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) ("The policy of equality among creditors . . . may be of significance in liquidation cases under Chapter 7, however, the paramount policy and goal of Chapter 11, *to which all other bankruptcy policies are subordinated*, is the rehabilitation of the debtor.") (emphasis added); see also, *Fields Station LLC v. Capitol Food Corp. of Fields Corner (In re Capitol Food Corp. of Fields Corner)*, 490 F.3d 21, 25 (1st Cir. 2007) (primary purposes of chapter 11 are preservation of businesses as going concerns and maximizing recoverable assets); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119 (3d Cir. 2004) (same); *Johnson v. Alvarez (In re Alvarez)*, 224 F.3d 1273, 1278 n.9 (11th Cir. 2000) (purpose of chapter 11 is to provide creditors with going-concern value rather than more meager satisfaction through liquidation); *Canadian Pacific Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1442 (6th Cir. 1995) (same); *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 373 (5th Cir. 1987), aff'd, 484 U.S. 365 (1988) (principal goal of reorganization is to "preserve going concern values and thereby enhance the amounts recovered by all creditors."); *Fitzsimmons v. Walsh (In re Fitzsimmons)*, 725 F.2d 1208, 1210 (9th Cir. 1984) ("Chapter 11 seeks to preserve a foundering business as a going concern, because the assets of a business are often more valuable when so maintained than they would be when liquidated").

[8]  *See Florida Dept. of Revenue v. Piccadilly Cafeteria, Inc.*, 128 S. Ct. 2326, 2331 n.2 (2008) (noting that chapter 11 "expressly contemplates" a debtor "selling substantially all its assets as a going concern" and then later submitting "a plan of liquidation (rather than a traditional plan of reorganization) providing for the distribution of the proceeds resulting from the sale"); *Van Huffel v. Harkelrode*, 284 U.S. 225, 227-28 n.1 (1931) (finding that, while the "Bankruptcy Act, unlike the Act of 1867, contains no provision which in terms confers upon bankruptcy courts the

117972/5537.01

of bankruptcy reorganizations in this country is replete with examples of debtors, facing circumstances similar to those the Debtor faces here, obtaining court approval (often at the outset of the case) to sell substantially all of their assets prior to the process of confirming a plan, in order to preserve the going concern value of the debtor's business.

In *Piccadilly*, for example, the Supreme Court addressed a tax dispute that arose after the debtor received bankruptcy court approval for the sale of substantially all of its assets three months after it filed its chapter 11 case. While Justice Breyer dissented from the majority's opinion in that case as to the proper tax treatment of the sale, he explained the justification for such sales at the outset of chapter 11 cases in appropriate circumstances:

> [O]ne major reason why a transfer may take place before rather than after a plan is confirmed is that the preconfirmation bankruptcy process takes time. . . . And a firm (or its assets) may have more value (say, as a going concern) where sale takes place quickly. . . . Thus, an immediate sale can often make more revenue available to creditors or for reorganization of the remaining assets.[9]

Here, the Sale – pragmatically the only alternative available to the Debtor to preserve the going concern value of its assets – meets the requirements of section 363 for the sale of the Debtor's operating assets free and clear of all liens and other interests in the assets to be sold. It should be approved.

**D.    The Sale Transaction Is Authorized By 11 U.S.C. § 363(b).**

Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "*the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.*"[10]  One of the rationales for granting this authority was

power to sell property of the bankrupt free from encumbrances," "[w]e think it clear that the power was granted by implication," and observing that "[t]he lower federal courts have consistently held that the bankruptcy court possesses the power, stating that it must be implied from the general equity powers of the court" and its duty to administer the estate); see generally, *Houston v. City Bank of New Orleans*, 47 U.S. 486, 506 (1848).

[9]  *Piccadilly*, 128 S. Ct. at 2342 (7-2 decision) (Breyer, J., dissenting) (citations omitted).

[10]  11 U.S.C. § 363(b)(1); see e.g., *In re Med. Software Solutions*, 286 B.R. 431, 441 (Bankr. D. Utah 2002) (court approved sale of essentially all of debtor's assets at outset of Chapter 11 case, finding (i) there would be substantial decrease in the value of the assets if not sold

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

-8-

explained by the District Court for the Southern District of California as follows:

> The salutary purpose of the Bankruptcy Act is to preserve the assets of the bankrupt for the benefit of the creditors.  An order authorizing the sale of the assets of the bankrupt is intended to effectuate this purpose.[11]

And other District Courts have recognized:

> "Judicial sales are an indispensable part of the machinery employed in administering bankrupt estates." [Citation.] Public policy requires that nothing be done to impair confidence in the stability of such judicial sales, and bona fide purchasers should not be deprived of their rights without just cause.[12]

The Code authorizes a debtor in possession to sell estate assets prior to and outside a plan of reorganization.[13]  Indeed, Section 363 is a grant of broad and flexible power to the bankruptcy court grounded in business judgment and practical reality.  In *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,[14] the Second Circuit explained its sweep and the precedential standards.  The court began with an historical overview of the bankruptcy provisions that have permitted the sale of a debtor's assets outside a final plan of liquidation or reorganization.[15]  The court noted that initially such sales were permitted only where the property to be sold was "*of a perishable nature, or likely to deteriorate in*

---

immediately, (ii) existing customers would be reluctant to purchase services and goods from company "in tenuous financial condition" and (iii) company would be "unsustainable as a going concern without additional capital - which is unavailable"); *In re Naron & Wagner, Chartered*, 88 B.R. 85, 90 (Bankr. D. Md. 1988) (approving sale of operating subsidiary where purchase price exceeded its estimated liquidation value and "failure to close the sale quickly will likely result in a halt of [the business'] continuous operations").

[11]  *In re Airlines Transport Carriers, Inc.*, 129 F. Supp. 679, 684 (S.D. Cal. 1955).

[12]  *In re Strunks Lane & Jellico Mountain Coal & Coke Co.*, 64 F. Supp. 731, 733 (D. Ky. 1946).

[13]  See e.g., *In re Naron & Wagner, Chartered*, supra (debtor authorized to sell all of its operating assets before filing a plan).

[14]  *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983).

[15]  *In re Lionel Corp.*, supra, 722 F.2d at 1066-68.

-9-

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

1    *value.*"[16]

2    Subsequently, the standard evolved beyond "*perishable*" situations, to cases where

3    property might lose value due to a broad range of economic exigencies.  Thus, in *In re*

4    *Pedlow*,[17] for example, the court authorized a private sale of a stock of handkerchiefs during

5    the Christmas season, noting that "*the sale of handkerchiefs depreciates greatly after the*

6    *holidays.*"[18] In support of its ruling, the *Pedlow* Court reasoned "*that 'perishable' fairly*

7    *construed, means property which, for any reason, will deteriorate in value and that what is*

8    *and what is not perishable may be safely left to the discretion of the court.*"[19]

9    Later, the principle was further extended to instances where "*a good business*

10    *opportunity was presently available, so long as the parties could act quickly.*"[20]  Ultimately,

11    an even broader standard emerged, as reflected in the seemingly unqualified language of

12    section 363(b).  Under that standard, as articulated in *Lionel*, a bankruptcy judge is afforded

13    "*considerable discretion*" in determining whether to allow a sale prior to confirmation of a

14    plan, but must "*expressly find . . . a good business reason to grant such an application.*"[21]

15    Here, the immediate sale of operating assets is necessary to preserve their going

16    concern value.  As the *Lionel* court's discussion of section 363(b) makes clear, the

18    [16]  *Id.* at 1066 (quoting Section 25 of the Bankruptcy Act of 1867, 14 Stat. 517).

19    [17]  *In re Pedlow*, 209 F. 841 (2d Cir. 1913).

20    [18]  *Id.* at 842.

21    [19]  *Id.*

22    [20]  *In re Lionel Corp.*, supra, 722 F.2d at 1069 (discussing *In re Sire Plan, Inc.*, 392 F.2d

23    497 (2d Cir. 1964)).

24    [21]  *In re Lionel Corp.*, supra, 722 F.2d at 1066 & 1071; see also, *Licensing by Paolo v.*
    *Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter

25    11 estate other than in the ordinary course of business may be conducted if a good business reason
    exists to support it"); *In re Chateaugay Corp.*, 973 F.2d 141, 144 (2d Cir. 1992)("The bankruptcy

26    court was within its discretion, based on its consideration of all the factors. . . to determine that a
    good business reason existed to proceed with the sale now even if the preferred stock amount does

27    not ultimately benefit creditors"); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y.
    2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *Walter v. Sunwest*

28    *Bank (In re Walter)*, 83 B.R. 14, 14-15 (9th Cir. BAP 1987).

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

117972/5537.01

quintessential "*good business reason*" on which reorganization courts have historically

justified the sale of a debtor's property prior to a plan is that any delay in the sale of the

property threatens to erode significantly the value of that property.[22]  As the *Lionel* court

stated, "[i]n such cases . . . *the bankruptcy machinery should not straightjacket the*

*bankruptcy judge so as to prevent him from doing what is best for the estate.*"[23]

Thus, courts applying 363(b) have routinely authorized the sale of a debtor's

operating assets in advance of the plan process where the debtor did not have sufficient

liquidity to continue operating, and the cessation of operations was likely or certain to result

in the debtor's inability to realize the going concern value of its business.[24]

The common thread that runs through all of the cases is that — as a matter of

pragmatic reality — the debtor could not sustain the costs of ongoing operation, and the

going concern value of its assets would suffer a foreseeable and substantial decline in the

absence of a prompt sale. That is exactly the situation the Debtor here now faces.  Because

delay in this instance will lead to an almost immediate loss in value for the Debtor' assets,

the Sale should be approved forthwith.

---

[22]  *In re Lionel Corp.*, supra, 722 F.2d at 1066-69; see also, In re V. Loewer's Gambrinus Brewery Co., 141 F.2d 747, 749 (2nd Cir. 1944).

[23]  *In re Lionel Corp.*, supra, 722 F.2d at 1069.

[24]  See, e.g., *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (approving sale of radio station where debtor lacked funds to continue operations and could lose broadcast license if station went off the air); *In re Brookfield Clothes, Inc.*, 31 B.R. 978 (S.D.N.Y. 1983) (approving sale of clothing manufacturer that had shut down due to lack of cash prior to petition date); *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 244 (Bankr. S.D. W.Va. 1996) (approving sale of coal producer that could not fund operations and was nearly out of cash needed to operate pumps that prevented mines from flooding); *In re WBQ P'ship*, 189 B.R. 97, 102-03 (Bankr. E.D. Va. 1995) (approving sale of nursing homes as necessary to protect going concern value); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992) (approving sale of ice cream producer that lacked cash needed to perform maintenance necessary to continue operations); *In re Titusville Country Club*, 128 B.R. 396, 400 (Bankr. W.D. Pa. 1991) (approving sale of golf course at start of golf season where debtor had inadequate funds to maintain course for the season); *In re Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (approving sale of radio station because of lack of funds needed to continue to operate); *In re Naron & Wagner, Chartered*, 88 B.R. at 90 (Bankr. D. Md. 1988) (approving sale of computer business where debtor was unable to continue operations due to lack of liquidity); *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (approving sale of tire plant that needed major capital infusion to reach necessary production levels); *In re Boogaart of Fla., Inc.*, 17 B.R. 480, 483 (Bankr. S.D. Fla. 1981) (approving liquidation of grocer operating at a continual loss).

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

117972/5537.01

**E.    Immediate Sale of the Purchased Assets Is Necessary to Realize Their Going Concern Value.**

The Debtor is running out of money.  As more fully appears from the cash flow budget for the period August 15 through November 30, 2009, a copy of which is attached hereto as Exhibit A and incorporated herein by this reference, the Debtor can expect to be operating at a cash deficit by October 2009, if the Sale Transaction is not completed by that time.  There is no source of funds available to the Debtor to fund that deficit.  That means that in the absence of the Sale Transaction the Debtor will likely be forced to terminate all operations by the end of October 2009.  Obviously, no going concern value can be preserved thereafter.

Current going concern value attributable to the Purchased Assets arises from the fact that they are necessary for and can be used in the performance of the Assumed Contracts. Once the Debtor no longer has the cash to sustain performance of those contracts, that value is lost.

Beyond that, the Debtor's loss of operating cash will predictably result in the breach of the Assumed Contracts.  If that occurs, the resulting damage claims against the estate are currently estimated at $7.92 Million.  Those claims will obviously and dramatically dilute any return to other general unsecured claims.  More importantly, those diluting claims can be avoided altogether by the immediate consummation of the Sale Transaction, which includes the transfer of the Assumed Contracts to a viable entity capable of performing those obligations.

**F.    Debtor Has Exercised Sound Business Judgment in Proposing the Sale.**

Prior to the commencement of this case, the Debtor was faced with two inescapable realities.  First, it's operating assets had considerable value if they could be sold while the Debtor's business was still operational, and a seamless transition between its operations and those of a buyer could be made.  Second, the decline in Debtor's business volume, and other business reversals left the Debtor with insufficient liquid resources to finance a Chapter 11 administration throughout the conventional and time-consuming process of proposing and

117972/5537.01

1  obtaining approval of a Chapter 11 plan. In fact, its ability to finance continued operations

2  was not expected to continue beyond October of 2009.

3          With those realities in mind, management undertook substantial efforts to locate

4  potential buyers for its unique set of operating assets. All reasonable prospects were

5  explored, and the negotiations that resulted in the Asset Purchase Agreement were

6  conducted in good faith and at arms length. In making its decision, management was also

7  mindful of the importance of avoiding the breach of contract claims that would result if the

8  Debtor's lack of cash lead to defaults on its executory contracts. At this point, those

9  obligations can be assumed and performed by the Purchaser/Successful Bidder. All of that

10 was considered in the context of the Debtor's extensive efforts to find a purchaser for its

11 assets, and the limited interest generated by those efforts. Those efforts culminated in the

12 Asset Purchase Agreement. The decision to enter into and perform that agreement reflects a

13 legitimate exercise of sound business judgment.

14 **G.    Quality Built, LLC Is A Good Faith Purchaser Entitled To The Full Protection
         Of Section 363(m) Of The Bankruptcy Code; And The Sale Transaction Does
15       Not Violate Section 363(n) Of The Bankruptcy Code.**

16         Section 363(m) of the Bankruptcy Code affords a good faith purchaser of a debtor's

17 assets pursuant to section 363 the assurance that a subsequent reversal of the Court's

18 decision authorizing the sale does not void the transaction. In particular, the statute

19 provides:

20              The reversal or modification on appeal of an authorization under
                subsection (b) or (c) of this section of a sale or lease of property
21              does not affect the validity of a sale or lease under such
                authorization to an entity that purchased or leased such property in
22              good faith, whether or not such entity knew of the pendency of the
                appeal, unless such authorization and such sale or lease were
23              stayed pending appeal.
                11 U.S.C. § 363(m).

24

25         Although the Bankruptcy Code does not define "good faith," the Ninth Circuit

26 Bankruptcy Appellate Panel recognizes that, for purposes of Section 363(m), a good faith

27 purchaser is a purchaser who buys "*in good faith*" and "*for value.*"[25] In *In re M Capital*

28
            [25] *In re M Capital Corp.*, 290 B.R. 743, 746 (B.A.P. 9th Cir. 2003).

                                    -13-                              117972/5537.01

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

1  *Corp.*, the court stated that "*typically, lack of good faith is shown by 'fraud [or] collusion*

2  *between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair*

3  *advantage.*'"[26] In *In re Onouli-Kina Land Co.*, the court held that a purchaser who followed

4  court approved bidding procedures did not have a "*grossly unfair advantage.*" (846 F.2d

5  1170, 1173-74 (9th Cir. 1988)).  Similarly, the Second Circuit has held that the "*[g]ood*

6  *faith of a purchaser is shown by the integrity of his conduct during the course of the sale*

7  *proceedings; where there is a lack of such integrity, a good faith finding may not be made.*

8  *A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other*

9  *bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.*'"[27]

10      There can be little question regarding the Purchaser/Successful Bidder's good faith

11  here. The Sale is the culmination of a prolonged effort on the part of the Debtor's senior

12  management to find a suitable acquisition candidate.  It was finalized only after intense,

13  good-faith negotiations between the Debtor, other candidates and Quality Built, LLC. Those

14  negotiations were conducted at arm's length, and reflect the Debtor's extraction of the

15  highest and best value available for its assets, particularly when considered against the

16  backdrop of the generally and severely depressed market conditions in the economic sector

17  that it inhabits.  Thus, the Debtor intends to, and hereby does, request that the Court make a

18  finding that Quality Built, LLC, or any other entity determined to be the Successful Bidder

19  is a good-faith purchaser entitled to the protections of section 363(m)

20  of the Bankruptcy Code.

21      Section 363(n) of the Bankruptcy Code allows a trustee to avoid a section 363

22  sale where there has been collusion among bidders. As there is no suggestion that the Sale

23  is the product of collusion, section 363(n) is inapplicable.

24  / / /

25      [26] *Id.* (citing *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276,281 (9th Cir.1992).

26

27      [27] *In re Gucci*, 126 F.3d at 390 (interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code) (quoting *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1992); *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Bel Air Assoc.*, 706 F.2d 301, 305

28  n.11 (10th Cir. 1983); *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988).

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-4200 · TELECOPIER (619) 400-4201

-14-                          117972/5537.01

**(1)    The Purchaser/Successful Bidder is Buying the Assets For Value.**

In addition, the Debtor is selling the Purchased Assets "*for value.*"[28] The court in *In re Abbotts Dairies of Penn., Inc.*, stated that "*[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets.*"[29] Here, the Purchased Assets are being sold at Auction. Debtor is advertising the Auction in a regional periodical, and responding to inquiries from potentially interested parties in an attempt to encourage additional bidders and bidding. In addition, the Bidding and Sale Procedures governing the Auction were designed to maximize the likelihood of overbidding to ensure that the Purchased Assets are sold "for value." Thus, because the Purchaser/Successful Bidder is purchasing the Purchased Assets in good faith and for value, the Successful Bidder is entitled to the protections of section 363(m).

**H.    The Sale Of The Debtor's Assets Free And Clear Of Liens And Interests Is Authorized By Section 363(f) Of The Bankruptcy Code.**

Section 363 of the Bankruptcy Code permits the sale of assets outside of the ordinary course of business. Section 105(a) of the Bankruptcy Code provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). The court may "*exercise its equitable power only as a means to fulfill some specific [Bankruptcy] Code provision.*"[30] Because a sale of substantially all assets is permitted under the Bankruptcy Code, section 105(a) of the Bankruptcy Code permits the Court to grant any relief necessary to approve the sale.[31] Pursuant to section 363(f) of the Bankruptcy Code, the Debtor may sell its operating assets free and clear of any interest in the property if any one of the following conditions is satisfied: (1) applicable nonbankruptcy law permits sale of such property free

---

[28]  See *In re M Capital Corp.*, 290 B.R. at 746; *In re Onouli-Kina*, 846 F.2d at 1174.

[29]  788 F.2d 143, 149 (3d Cir. 1986).

[30]  *In re Saxman*, 325 F.3d 1168, 1174-75 (9th Cir. 2003)(quoting *In re Fesco Plastics Corp.*, 996 F.2d 152,154 (7th Cir. 1993)).

[31]  *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986)(the court may "fashion orders as necessary pursuant to the purposes of the Bankruptcy Code").

117972/5537.01

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-6200 · TELECOPIER (619) 400-2201

1    and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at

2    which such property is to be sold is greater than the aggregate value of all liens on such

3    property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a

4    legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. §

5    363(f). As discussed below, at least one of these conditions – (f)(2), (f)(3) or (f)(5)– apply to

6    the holders of secured claims on the assets being sold.

7         *(1)    Section 363(f)(2) Is Satisfied as to Those Parties who Have Failed To
              Object to the Sale.*

8

9         Section 363(f)(2) applies to those parties who have failed to object or otherwise

10   dispute the proposed Sale. As dozens of courts have recognized, where an entity has not

11   objected to a section 363 sale, consent may be implied for purposes of section 363(f)(2).[32] In

12   light of these authorities, any party in interest in this case who has failed to object to the

13   Sale should be deemed to have consented to the sale of the Debtor's assets free and clear of

14   any liens, claims, interests and encumbrances pursuant to section 363(f)(2) of the

15   Bankruptcy Code.

16        Beyond implied consent, Elizabeth Michaelis, the holder of the second priority

17   blanket lien, has expressly consented to the Sale free and clear of her lien as proposed by

18   this motion.

19   / / /

20   / / /

21   / / /

22   / / /

23   _____

24        [32]  See, e.g., *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) (in
     context of section 363(f), "lack of objection (provided of course there is notice) counts as
25   consent."); *In re James*, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997) (section 363(f)(2) satisfied
     where secured creditor failed to object to proposed sale and thus "implicitly conveyed its consent
26   to the sale"); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (because of tax lien
     holder's failure to object to sale, it "may be deemed to have consented to the sale for purposes of
27   section 363(f)(2)"); *In re Elliot*, 94 B.R. 343, 345-46 (E.D. Pa. 1988) (implied consent sufficient
     to authorize section 363(f)(2) sale; consent implied from non-debtor that "received notice of the
28   proposed sale and also admits that it did not file any timely objection."); *In re Gabel*, 61 B.R. 661,
     664-65 (Bankr. W.D. La. 1985) (estopping secured creditor that was properly noticed and failed to
     object from denying its implied consent to sale of property under 363(f))

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-5200 · TELECOPIER (619) 400-2201

117972/5537.01

    (2)       *Section 363(f)(3) Is Satisfied Because the Sale Price is Greater than the Aggregate Value of the Liens on the Property.*

          (a)      *"Aggregate value of all liens" means the economic value of those liens.*

A sale can be made free and clear of any liens pursuant to section 363(f)(3) so long as the purchase price exceeds "the aggregate value of all liens on such property." 11 U.S.C. § 363(f)(3). Here the aggregate value is at most equal to the amount of the claims secured by the liens. Other than the secured claim of Elizabeth Michaelis (who consents to the Sale Transaction), the purchaser/Successful Bidder will be assuming and paying those claims in full and in accordance with their terms.[33]

          (b)      *The purchase price exceeds the economic value of the liens on the property being sold.*

The full economic value of the liens is satisfied by the assumption obligations created by paragraph 2.1 of the Asset Purchase Agreement. In addition, the purchase price includes a cash component of at least $150,000.00. Thus, the economic value of the total purchase price exceeds the value of the liens held by secured creditors other than Elizabeth Michaelis.

          (c)      *The Sale Transaction satisfies Section 363(f)(5) because all of the secured creditors affected could be compelled to accept money in satisfaction of their claims.*

All of the secured creditors affected by the Sale Transaction hold contract claims for the payment of money. Not surprisingly, under California law they could be compelled to accept money in satisfaction of their claims.[34]

          (d)      *The Sale Of The Offered Assets May Be Made Free And Clear Of Liens Because Secured Creditors' Interests Have Been Afforded Adequate Protection As Required By Section 363(e).*

When a debtor in possession proposes to sell property pursuant to section 363 of the Bankruptcy Code, subsection (e) of that section affords any entity with an interest in that

---

[33] See Exhibit 1, Asset Purchase Agreement at ¶ 2.1, and Schedule 2.1(i).

[34] See Cal. Civ. Code §§ 1473, 1478 and 1500.

-17-

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

117972/5537.01

1   property the right to request "*adequate protection*" of that interest. At least one Circuit has

2   characterized as "*long recognized*" the principle that "*when a debtor's assets are disposed of*

3   *free and clear of third-party interests, the third party is adequately protected if his interest*

4   *is assertable against the proceeds of the disposition.*"[35]

5           Here, any unsatisfied lien rights in the transferred assets will attach to the cash

6   proceeds (in the order of their prospective priorities) of the Sale. Additionally, the

7   obligation of CB&T is being fully assumed, according to its terms, by the

8   Purchaser/Successful Bidder in the Sale Transaction. The other lien claims are also being

9   assumed by the Purchaser. Thus, all lienholders' interests are adequately protected as

10  required by section 363(e), such that the Debtor's assets can be sold under section 363(b).

11          *(3)     "Interest" is Broadly Interpreted by the Courts.*

12          The Debtor is permitted to sell free and clear of any interest in the property being

13  sold.[36] The courts have extended the definition of "any interest in the property" beyond *in*

14  *rem* interests in property to include claims that are connected to or arise from the property.[37]

15  In *In re Trans World Airlines*, the court stated that "'*the term 'any interest' is intended to*

16  *refer to obligations that are connected to, or arise from, the property being sold.*'"[38]   In

17  *Myers v. U.S.*, the court followed the reasoning of *In re Trans World Airlines*, and

18  determined that a personal injury claim was an "interest in property" within the meaning of

19

20

---

21          [35]   *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) (citing *Ray v.*
22  *Norseworthy*, 90 U.S. 128, 134-35 (1874)); S. Rep. No. 95-989 (1978), reprinted in U.S. Code
    Cong. & Admin. News, 1978, pp. 5787, 5842 (committee report on 11 U.S.C. § 363(f)) ("Most
23  often, adequate protection in connection with a sale free and clear of other interests will be to have
    those interests attach to the proceeds of the sale."); see also *In re Collins*, 180 B.R. 447, 453
24  (Bankr. E.D. Va. 1995) ("The commonly accepted method for adequate[ly] protecting a secured
    creditor when a sale is authorized under § 363(f) is to order the liens to attach to the proceeds of
25  the sale").

26          [36]   11 U.S.C. § 363(f).

27          [37]   *In re Trans World Airlines*, 322 F.3d 283, 289-90 (3d Cir 2003).

28          [38]   322 F.3d at 289-90 (3d Cir 2003) (quoting *Folger Adam Sec., Inc. v.*
    *DeMatteis/MacGregor, JV*, 209 F.3d 252 (3d Cir. 2000)).

117972/5537.01

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 · TELECOPIER (619) 400-2201

1    section 363(f) of the Bankruptcy Code.[39]  Thus, because the debtor's assets were sold "free

2    and clear" of any interests, the assets were sold free and clear of the plaintiff's personal

3    injury claim because the claim *arose from* the Debtor's property.  (297 B.R. at 776-80

4    (emphasis added)). The same logic applies to any other creditor of the estate that may later

5    assert that they have an interest in the assets being sold because the claim *arose from* the

6    Debtor's property. Those interests can, should and will be cut off by the Sale Transaction.

7    **I.    The Debtor's Assumption and Assignment To The Purchaser Of The Assumed**
8         **Contracts Is Authorized By Section 365 Of The Bankruptcy Code**

9         Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor to assume,

10   subject to court approval, executory contracts or unexpired leases.  Under section 365(a), a

11   debtor, "subject to the court's approval, may assume or reject any executory contract or

12   unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the

13   requirements for assuming an unexpired lease or executory contract as follows:

14            (b)(1) If there has been a default in an executory contract or
              unexpired lease of the debtor, the trustee may not assume such
15            contract or lease unless, at the time of assumption of such contract or
              lease, the trustee—
16            (A) cures, or provides adequate assurance that the trustee will
              promptly cure, such default other than a default that is a breach of a
17            provision relating to the satisfaction of any provision (other than a
              penalty rate or penalty provision) relating to a default arising from
18            any failure to perform nonmonetary obligations under an unexpired
              lease of real property, if it is impossible for the trustee to cure such
19            default by performing nonmonetary acts at and after the time of
              assumption, except that if such default arises from a failure to operate
20            in accordance with a nonresidential real property lease, then such
              default shall be cured by performance at and after the time of
21            assumption in accordance with such lease, and pecuniary losses
              resulting from such default shall be compensated in accordance with
22            the provisions of this paragraph;
              (B) compensates, or provides adequate assurance that the trustee will
23            promptly compensate, a party other than the debtor to such contract
              or lease, for any actual pecuniary loss to such party resulting from
24            such default; and
              (C) provides adequate assurance of future performance under such
25            contract or lease. 11 U.S.C. § 365(b)(1).

26   / / /

27

28
         _____
         [39]  297 B.R. 774, 781-82 (S.D. Cal. 2003).

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-2200 ~ TELECOPIER (619) 400-2203

117972/5537.01

1    Like a proposed sale of assets under section 363, a debtor's decision to assume

2  and assign, or to reject, an executory contract or unexpired lease under section 365 is

3  subject to a *sound business judgment* standard.[40] A court will approve the assumption of

4  executory contracts and unexpired leases under section 365 upon a finding that the debtor

5  has exercised sound business judgment in determining that assumption is in the best

6  interests of the debtor, its creditors and other parties in interest.[41]

7    Here, the Debtor seeks authority to assume (and assign) the Assumed Contracts.

8  The proposed Sale will provide significant benefits to the Debtor' estate, because: (a) much

9  of the value of the Purchased Assets is attributable to the fact that they can be used to

10  perform the Assumed Contracts, and (b) allowing the assumption and assignment will

11  eliminate the potential for large breach of contract claims arising from the Debtor's inability

12  to perform the contracts to conclusion. Because those benefits depend upon the assumption

13  of the Assumed Contracts, that assumption falls within the sound exercise of the Debtor's

14  business judgment. Further, a debtor-in-possession may assign an executory contract or

15  unexpired lease if it does so in accordance with section 365(a), and provides adequate

16  assurance of future performance by the assignee. See 11 U.S.C. § 365(f)(2). Although not

17  defined in the Bankruptcy Code, the meaning of "adequate assurance of future performance"

18  depends on the facts of each case, and Congress intended that it be given "*practical,*

19

20

21

22  [40] See, e.g., *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (Section 365 "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts

23  of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject").

24

25  [41] See, e.g., *In re Turbowind, Inc.*, 42 B.R. 579, 584 (Bankr. S.D. Cal. 1984) ("As stated by the Supreme Court in *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R.R. Co.*, 318 U.S. 27 523, 550 ... (1943), '[t]he question whether a lease should be

26  rejected... is one of business judgment.' Virtually all recent bankruptcy court decisions follow the 'business judgment' rule as the standard for approval or disapproval of the debtor-in-possession's

27  decision to reject an executory contract."); see also *In re Bradlees Stores, Inc.*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *In re Johns-Manville Corp.*, 60 B.R. at 615-16 ("[T]he Code favors

28  the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-8200  TELECOPIER (619) 400-8201

117972/5537.01

1   *pragmatic construction based on . . the circumstances of each case.*"[42]

2          Adequate assurance under section 365 does not require an absolute guarantee of

3   performance.[43]  Among other things, adequate assurance may be provided by demonstrating

4   the assignee's financial health and experience in managing the type of enterprise or property

5   assigned.[44]

6          Pursuant to the terms of the Asset Purchase Agreement, all applicable Cure Amounts

7   in connection with the Assumed Contracts will be paid by the Debtor. To the extent

8   necessary to satisfy the Court, the Debtor and the Purchaser/Successful Bidder will

9   demonstrate at the hearing on this motion that it: (a) has assets sufficient to make the Cure

10  payments, and that the Purchaser has assets sufficient to provide adequate assurance of

11  future performance, and (b) is willing and able to perform under the Assumed Contracts.

12         The hearing on this motion will therefore provide the Court and other interested

13  parties the opportunity to evaluate both the Debtor's ability to pay the amounts necessary to

14  Cure prior Defaults, and the ability of the Purchaser to provide adequate assurance of future

15  performance under the Assumed Contracts, as required by section 365(b)(1)(C) of the

16  Bankruptcy Code. Accordingly, the Debtor submits that the assumption and assignment of

17  the Assumed Contracts as set forth herein should be approved.

18  / / /

19

20          [42] *In re PRJ Enterprises, Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tx. 1999) (*quoting In re*
21  *Prime Motor Inns, Inc.*, 166 B.R. 933, 997 (Bankr. S.D. Fla. 1994)); *In re Sanshoe Worldwide
    Corp.*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citing *In re Bygaph*, 56 B.R. 596, 605 (Bankr.
22  S.D.N.Y. 1986); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985), aff'd, 993
    F.2d 300 (2d Cir. 1993).

23          [43] See, e.g., *In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 754 (Bankr. S.D.N.Y.
24  1986) ("The test is not one of guaranty but simply whether it appears that the [obligations] will be
    paid and . . . met"); *Natco*, supra, 54 B.R. at 440 ("As designed by Congress, the phrase [adequate
25  protection] does not mean absolute insurance that the debtor will thrive and make a profit.")
    (citing *In re Alipat, Inc.*, 36 B.R. 274, 278 (Bankr. E.D. Mo. 1984)).

26          [44] See, e.g., *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309-10 (5th
27  Cir. 1985) (adequate assurance was present where debtor' income was sufficient to make lease
    payments); *Bygaph*, supra, 56 B.R. at 605-06 (adequate assurance of future performance present
28  where prospective lease assignee with adequate financial resources has expressed willingness to
    devote funding sufficient to afford business strong likelihood of succeeding).

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 400-8200 · TELECOPIER (619) 400-8201

117972/5537.01

1    To facilitate the assumption and assignment of the Assumed Contracts, the Debtor

2 also requests an order providing that any anti-assignment provisions in the Assumed

3 Contracts shall not limit or prohibit the assumption or assignment of the Assumed

4 Contracts, and are deemed to be unenforceable anti-assignment provisions within the

5 meaning of section 365(f) of the Bankruptcy Code. Section 365(f)(1) provides:

6      [N]otwithstanding a provision in an executory contract or unexpired lease of
       the debtor, or in applicable law, that prohibits, restricts, or conditions the
7      assignment of such contract or lease, thetrustee may assign such contract or
       lease under paragraph (2) ofthis subsection.11 U.S.C. § 365(f)(l).
8

9 Section 365(f)(l) thus invalidates provisions that purport to prohibit, restrict or condition

10 assignment of an executory contract or unexpired lease.[45]

11    Section 365(f)(3) expands even further a debtor's right to assume and assign by

12 prohibiting enforcement of any clause creating a right to modify or terminate a contract or

13 lease upon a proposed assumption or assignment thereof.[46]

14    Under these established principles, the Debtor requests that any provisions contained

15 in the Assumed Contracts that directly or indirectly purport to limit the Debtor's ability to

16 assign any of those agreements be deemed unenforceable under section 365(f) of the

17

18    [45] See, e.g., *In re The Circle K Corp.*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle
19 of bankruptcy or contract law precludes us from permitting the Debtor here to extend their leases
    in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section
20 365").

21    [46] See, e.g., *In re Jamesway Corp.*, 201 B.R. 73, 77-78 (Bankr. S.D.N.Y. 1996) (section
    365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is
22 being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions,
    not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-
23 assignment effect); see also *Ramco- Gershenson Props., L.P. v. Serv. Merch. Co., Inc.*, 293 B.R.
    169, 174 (M.D. Tenn. 2003) ("courts may temporarily render anti-assignment clauses
24 unenforceable so that a debtor's assignment is not blocked"); *In re Rickel Home Ctrs., Inc.*, 240
    B.R. 826, 831 (D. Del. 1998), app. dismissed, 209 F.3d 291 (3d Cir. 2000), cert. denied, 531 U.S.
25 873 (2000) ("In interpreting Section 365(f), courts and commentators alike have construed the
    terms to not only render unenforceable lease provisions which prohibit assignment outright, but
26 also lease provisions that are so restrictive that they constitute de facto anti-assignment
    provisions."); *In re Mr. Grocer, Inc.*, 77 B.R. 349, 354 (Bankr. D.N.H. 1987) ("the court does
27 retain some discretion in determining that lease provisions, which are not themselves *ipso facto*
    anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there
28 is no substantial economic detriment to the landlord shown, and in which enforcement would
    preclude the bankruptcy estate from realizing the intrinsic value of its assets").

KEEHN & ASSOCIATES, APC
ATTORNEYS AT LAW
402 WEST BROADWAY, SUITE 1210
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 406-2200 · TELECOPIER (619) 406-2201

117972/5537.01

1    Bankruptcy Code.

2                           IV.    CONCLUSION

3         The Debtor has an opportunity to extract value from its operating assets, but that

4    opportunity is severely constrained by a very narrow "*window of opportunity.*"  The Asset

5    Purchase Agreement, and the Sale Transaction that is contemplated provides the vehicle by

6    which the Debtor can seize the opportunity and thereby garner substantial benefit to its

7    creditors and the estate.  But, the *window* is rapidly closing and may vanish altogether by

8    October.  At the same time, the proposed sale is fair, just, and equitable to all constituencies

9    in the case, and it conforms to all applicable provisions of the Bankruptcy Code.  For this

10   and all of the reasons set forth above, the Asset Purchase Agreement, and the Sale

11   Transaction, including assumption and assignment of the Assigned Contracts, should be

12   approved forthwith.

13

14   Date:  August 20, 2009                          KEEHN & ASSOCIATES, APC

15

16                                      By:    //s// L. Scott Keehn
                                              L. Scott Keehn
17                                            [Proposed] Attorneys
                                              for Debtor and Debtor-in-Possession
18                                            **Qualitybuilt.com, a California
                                              corporation**

19

20

21

22

23

24

25

26

27

28

-23-                                                    117972/5537.01

# EXHIBIT A

QualityBuilt.com
Budget
August 15 - November 30, 2009
Cash Basis

| | August | September | October | November | Total |
|---|---|---|---|---|---|
| Revenues Received | 135,000.00 | 275,000.00 | 275,000.00 | 0.00 | 685,000.00 |
| Cash from sale of business | 0.00 | 0.00 | 150,000.00 | 0.00 | 150,000.00 |
| Rent from Equipment Leases to Subcontractors | 2,000.00 | 2,000.00 | 2,000.00 | 0.00 | 6,000.00 |
| Reimb of Costs paid for PPC employees (1) | 5,550.00 | 2,600.00 | 2,600.00 | 0.00 | 10,750.00 |
| PPC payment for use of QB Employees (1) | 3,000.00 | 1,500.00 | 0.00 | 0.00 | 4,500.00 |
| COBRA Payments | 2,067.00 | 2,100.00 | 2,100.00 | 0.00 | 6,267.00 |
| Reimb of ARRA COBRA Subsidy | 1,585.00 | 1,600.00 | 1,600.00 | 0.00 | 4,785.00 |
| **Total Sources of Cash** | **149,202.00** | **284,800.00** | **433,300.00** | **0.00** | **867,302.00** |
| | | | | | |
| | | | | | |
| Expenses | | | | | |
| Payroll (Wages, taxes, garnishments) (4) | 85,000.00 | 170,000.00 | 255,000.00 | 10,875.00 | 520,875.00 |
| PR Fees (Reg PR, 401k admin, timeclock) | 800.00 | 1,000.00 | 1,200.00 | 0.00 | 3,000.00 |
| Subcontractors (based on $ Collected) (2) | 12,000.00 | 22,313.00 | 16,000.00 | 0.00 | 50,313.00 |
| Interest on Line of Credit | 0.00 | 1,300.00 | 1,300.00 | 1,300.00 | 3,900.00 |
| Health Insurance | 18,500.00 | 18,150.00 | 18,150.00 | 0.00 | 54,800.00 |
| Business Insurance (GL,Comm, Auto, Prof Liab) | 16,600.00 | 15,900.00 | 6,355.00 | 0.00 | 38,855.00 |
| Workers Comp Insurance (6) | 0.00 | 6,362.00 | 6,362.00 | 6,362.00 | 19,086.00 |
| Telephone/Internet | 2,700.00 | 4,100.00 | 4,100.00 | 4,100.00 | 15,000.00 |
| Utilities (Electric/Water) | 240.00 | 6,300.00 | 7,100.00 | 7,100.00 | 20,740.00 |
| Employee Travel Exp (Air/Hotel/Car) (5) | 7,950.00 | 7,700.00 | 7,200.00 | 5,700.00 | 28,550.00 |
| Employee Reimbursements (Mileage/Meals) | 5,000.00 | 10,000.00 | 15,000.00 | 0.00 | 30,000.00 |
| Cell Phone | 0.00 | 2,544.00 | 2,400.00 | 2,400.00 | 7,344.00 |
| Subtotal | 148,790.00 | 265,669.00 | 340,167.00 | 37,837.00 | 792,463.00 |
| **Net Cash before Rent** | **412.00** | **19,131.00** | **93,133.00** | **(37,837.00)** | **74,839.00** |
| Potential Use of Cash: | | | | | |
| Rent (3) | 20,000.00 | 20,000.00 | 20,000.00 | 0.00 | 60,000.00 |
| **Net Cash after Rent** | **(19,588.00)** | **(869.00)** | **73,133.00** | **(37,837.00)** | **14,839.00** |
| | | | | | |
| Professional Services (non-cash flow) | 8,000.00 | 5,000.00 | 9,000.00 | 2,000.00 | 24,000.00 |

Footnotes:

(1) PPC is Pacific Property Consultants, Inc, a related party owned by Stan Luhr.  The two PPC employees
    are on QB's health insurance bills, cell phone bills, and the 401(k) pmt is paid by QB for them.  Also, the
    Accounting department for QB performs accounting functions for PPC and bills a flat amount for that service
    monthly.  The amounts reflected here are the out of pocket hard costs and Accounting billing per month.

(2) Includes $19,313 not yet paid that should have been paid on 8/14/09 - pay 50% on 8/28/09 and 50% on 9/11/09

(3) Rent obligation to insider LLC's will only be paid once all other expenses are paid and there is remaining cash

(4) October is a three pay period month. QB's payroll is generated bi-weekly and paydates are 10/2, 10/16, and 10/30

(5) Nov. Employee travel payments are for expenses incurred in October, but the bill won't be received until November.

(6) Workers Comp Insurance for Nov is the final payment owed by QB prior to the policy cancellation due to the
    assignment of employees to the new LLC.

Assumptions: New company (Qualitybuilt, LLC) will assume rent payments in November.  General Counsel will
    remain an employee of Qualitybuilt.com.